Rene L. Valladares
Federal Public Defender
Nevada State Bar No. 11479
Heidi Ojeda
Assistant Federal Public Defender
411 E. Bonneville, Ste. 250
Las Vegas, Nevada 89101
(702) 388-6577
Heidi_Ojeda@fd.org

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| United States of America, | Case No. 2:17-cr-00384-RFB-VCF |
| Plaintiff, | **Emergency Motion for Order Reducing Sentence or Modifying Judgment under 18 U.S.C. § 3582(c)(1)(A)(ii)** |
| v. | |
| Gino Miller, | **(Expedited Ruling Requested due to COVID-19 pandemic)** |
| Defendant. | |

Gino Miller is serving an 87-month sentence, which is set to expire in August of 2023.  The COVID-19 pandemic and the increased risk the virus poses to Mr. Miller are extraordinary and compelling reasons warranting compassionate release.  Because release is also appropriate under the applicable § 3553 sentencing factors, this Court should reduce his sentence to time served (about 39 months), leaving the supervised-release portion of his judgment untouched.  Should this Court believe that additional punishment is necessary, it should modify Miller's conditions to include home confinement for the remainder of his custodial term, approximately 36 months.

1
2
3
4
5

**Background**

In April of 2017, the government filed a complaint against Mr. Miller.[1] Mr. Miller pled guilty to a criminal information charging coercion and enticement pursuant to a binding plea agreement in February of 2018. This Court followed the plea agreement and sentenced Miller to 87 months' imprisonment.[2]

6
7
8
9

Mr. Miller's projected release date is August 10, 2023. At this time, he has served nearly 50% of his sentence. Given his poor health and complications from COVID-19, extraordinary and compelling reasons warrant his release from custody.

10
11

**Analysis**

**A.    Compassionate release before the First Step Act**

12
13
14
15
16
17
18
19
20
21

The compassionate release statute empowers courts to reduce a defendant's sentence whenever "extraordinary and compelling reasons warrant such a reduction."[3]  The statute was first enacted as part of the Comprehensive Crime Control Act of 1984 to serve as a "safety valve" to enable judges to reassess whether a sentence reduction was warranted by factors previously addressed through the abolished parole system.[4]  The Act left the Sentencing Commission to define what constituted "extraordinary and compelling reasons," which it defined as including medical conditions, age, family circumstances, and "other reasons."[5]

22
23
24
25
26

---

[1] ECF No. 1.

[2] ECF No. 52.

[3] 18 U.S.C. § 3582(c)(1)(A)(i).

[4] S. Rep. No. 98-225, at 121 (1983).

[5] U.S.S.G. § 1B1.13, comm. n.1(A).

2

As originally enacted, the statute left sole discretion for filing compassionate release motions with the Director of the Bureau of Prisons.  But, during the next three decades, the BOP rarely filed motions on behalf of inmates who met the eligibility criteria.[6]

**B.    Compassionate release after the First Step Act**

On December 21, 2018, the President signed the First Step Act into law, changing § 3582, most significantly, by allowing defendants to directly petition courts for relief instead of leaving relief decisions solely with the BOP.[7]  As amended, the compassionate release statute authorizes district courts to grant relief whenever "extraordinary and compelling reasons" warrant a reduction and when doing so is consistent with § 3553(a) sentencing factors and any policy statements from the Sentencing Commission, to the extent either are applicable.

---

[6] According to BOP statistics provided to Congress, BOP received 3,122 requests for compassionate release between 2014 and 2017.  Of those, 817 requests involved terminal illness, with the BOP only approving 306 of those requests—less than 10% of the total requests.  It also took the BOP an average of almost 7 months to make its approval decision, during which **81 prisoners died waiting for the BOP's answer**.  *See* https://compassionaterelease. com/compassionate-release-statistics.  *See also United States v. Beck*, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019) (noting BOP's "grossly inadequate treatment" and granting compassionate release); Dep't of Justice, Office of the Inspector General, The Federal Bureau of Prisons' Compassionate Release Program (April 2013), at 11, available at https://oig.justice. gov/reports/2013/ e1306.pdf ("The BOP does not properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered."); U.S.S.G. § 1B1.13, n.4 (admonishing BOP for its past failure to pursue relief on behalf of eligible inmates).

[7] 18 U.S.C. § 3582(c)(1)(A).

3

Although Congress again charged the Sentencing Commission with defining what "extraordinary and compelling reasons" would be,[8] the most recent version of the Sentencing Commission's Guidelines Manual (November 1, 2018) predates the First Step Act (enacted December 21, 2018).  There, the Commission enumerated three specific "reasons" that qualify as "extraordinary and compelling": (A) terminal illness diagnoses or serious medical, physical or mental impairments from which a defendant is unlikely to recover which "substantially diminish" the defendant's capacity for self-care in prison; (B) aging-related health decline where a defendant is over 65 years old and has served at least ten years or 75% of his sentence; or (C) two family related circumstances: (i) death/incapacitation of the only caregiver for the inmate's children or (ii) incapacitation of the inmate's spouse, if the inmate is the spouse's only caregiver."[9]  The guideline also includes a catchall provision, (D), that gave the Director of the BOP the authority to determine if "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with," the other three categories.[10]

The Commission has not updated its policy statement to account for the changes imposed by the First Step Act, and the policy statement is now clearly outdated.  The very first sentence constrains the entire policy statement to motions filed solely by the BOP; an application note also explicitly confines the policy statement to such motions;[11] and the catchall provision leaves the Director

---

[8] 28 USC § 994(t).

[9] U.S.S.G. § 1B1.13 cmt. n.1 (A)–(C).

[10] *Id.* cmt. n.1(D).

[11] *See* USSG § 1B1.13; *Id.*, at cmt. n.4

4

of the Bureau of Prisons to define what may constitute "other reasons" than those specifically set forth in subsections (A)–(C).[12]

"[A] majority of district courts have concluded that the "old policy statement provides helpful guidance, [but] . . . does not constrain [a court's] independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)."[13]  These courts have interpreted Congress' intent in passing the First Step Act, and specifically the amendment to § 3582(c)(1)(A), to have been to "increase the use of compassionate release" by entrusting the district courts with the discretion previously entrusted to the BOP director.[14]  If inmates are permitted to move for compassionate

---

[12] *See* USSG § 1B1.13 cmt. n.1(A)–(D).

[13] *United States v. Brown*, 411 F. Supp. 3d 446, 448 (S.D. Iowa 2019) ("[T]he most natural reading of the amended § 3582(c) . . . is that the district court assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it."); *See also United States v. Beck*, 425 F.Supp.3d 573, 582 (M.D.N.C. 2019); *United States v. Rodriguez*, ⸺ F.Supp.3d ⸺, ⸺, 2020 WL 1627331, at *3 (E.D. Penn. Apr. 1, 2020); *United States v. Fox*, 2019 WL 3046086, at *3 (D. Me. July 11, 2019) ("[D]eference to the BOP no longer makes sense now that the First Step Act has reduced the BOP's role."); *United States v. Redd*, ⸺ F.Supp.3d ⸺, ⸺, 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020) ("Application Note 1(D)'s prefatory language, which requires a [catchall] determination by the BOP Director, is, in substance, part and parcel of the eliminated requirement that relief must be sought by the BOP Director in the first instance. . . . [R]estricting the Court to those reasons set forth in § 1B1.13 cmt. n.1(A)–(C) would effectively preserve to a large extent the BOP's role as exclusive gatekeeper, which the First Step Act substantially eliminated. . . ."); *United States v. Young*, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020) ("[T]he dependence on the BOP to determine the existence of an extraordinary and compelling reason, like the requirement for a motion by the BOP Director, is a relic of the prior procedure that is inconsistent with the amendments implemented by the First Step Act."); *Garcia-Zuniga*, 2020 WL 3403070, *1; *United States v. Defendant(s)*, 2020 WL 1864906, at *5 (C.D. Cal. Apr. 13, 2020); *United States v. Rodriguez*, 424 F.Supp. 3d 674 681–82 (N.D. Cal. Nov. 25, 2019); *United States v. Cantu*, 423 F. Supp. 3d 345, 351 (S.D. Tex. June 17, 2019).

[14] *Brown*, 411 F. Supp. 3d at 451.

5

1
2
3

release even when the BOP disagrees, it follows that Congress wanted "to allow district court judges to consider the vast variety of circumstances that may constitute 'extraordinary and compelling.'"[15]

4
5
6
7
8

With this legislative history in mind and without current guidance from the Sentencing Commission, many courts have found the COVID-19 pandemic to be "extraordinary and compelling," particularly when the defendant has underlying health issues, has tested positive for COVID-19 (even if asymptomatic or recovered), or is housed in a facility where others have tested positive.[16]

9

10
    [15] *Id.*

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

    [16] *United States v. Carter*, No. 16-cr-156, at *1 (D.D.C. June 10, 2020) (granting sentence reduction for 76-year old sex offender having served 48-months of 80-month sentence and who had tested positive, was asymptomatic, "no other documented health issues," and noting inmate was at "heightened risk of developing serious complications should he be exposed again," and if released, inmate "will be able to more effectively avoid contracting COVID-19"); *United States v. Brown*, Case No. 2:18-cr-360, ECF No. 35 (N.D. Ala. May 22, 2020); *United States v. Arreola-Bretado*, Case No. 3:19-cr-3410, ECF No. 50 (S.D. Cal. May 15, 2020) (granting compassionate release to defendant who tested positive for COVID-19 after concluding she will receive superior medical care outside of the custody of the Otay Mesa detention facility); *United States v. Fischman*, 16-cr-00246-HSG-1, ECF No. 76 (N.D. Cal. May 1, 2020) (granting compassionate release from Terminal Island to COVID-19-positive defendant); *United States v. Kriglstein*, 1:16-cr-00663-JCH-1, ECF No. 60 (D.N.M. Apr. 27, 2020) (staying for 5 days release of defendant who was tested for COVID-19 as condition of order granting compassionate release, with positive result); *United States v. Huntley*, No. 13-cr-119-ABJ, ECF No. 263, at 8 n.9, 10 (D.D.C. May 5, 2020) (ordering compassionate release for defendant who tested positive for COVID-19 while motion was being litigated); *United States v. Kess*, No. ELH-14-0480, ECF No. 57 at 11-13 (D. Md. June 17, 2020); *United States v. Williams*, No. PWG-19-0134, ECF No. 70 at 7 (D. Md. June 10, 2020); *United States v. Heyward*, No. 17-cr-527, ECF No. 83 (D. Md. June 30, 2020) (releasing inmate with hepatitis C, hypertension, who tested positive and "has since recovered from the virus" and noting that government does not dispute that "secondary contraction of COVID-19 is possible"); *United States v. Jacobs*, No. 19-cr-149, ECF No. 84 (S.D. Ia. July 2, 2020) (defendant tested positive and has been treated with "Tylenol and sequestration," continues to test positive a month later, and is granted 3582 sentence reduction while still held at county jail); *United States v. Plank*, No. 17-cr-20026, at *5-6 (D. Kan. July 2, 2020) (noting "despite the BOP's measures"

Others have granted compassionate release—even when the defendant has no underlying health concerns and has not contracted the virus—simply due to current conditions within the Bureau of Prisons and lack of available programming.[17]  Some have defined "other reasons" to include defendants sentenced using overly harsh and now-defunct mandatory minimums without regard to any health risks to the defendant and independent of the pandemic.[18]

This Court should view the 2018 Guidelines as persuasive but not binding. This Court should then exercise its discretion to hold that the current pandemic and the health risks it poses to Miller as "extraordinary and compelling reason" to grant compassionate release.

---

over "one-third of the population has been infected" at Forrest City, and finds that despite being covid-positive, "the risk to defendant remains, as it has not been established that a person becomes completely immune to the virus after infection"); *United States v. Lipp*, No. 17-cr-40057 (D. Kan. July 29, 2020) (inmate already "contracted COVID-19 . . . which caused him to be hospitalized," and "[a]lthough he has recovered, health concerns remain"); *United States v. McCall*, No. 18-cr-95, at 14 (M.D. Ala. June 4, 2020) (granting motion for covid-positive inmate with sickle cell disease; "the court finds the BOP completely unequipped with regard" providing adequate care and the "fatal risk posed to McCall if he does not receive this necessary care").

[17] *See, e.g., U.S. v. Rangel*, 3:19-cr-00071-SLG ECF No. 54 (D. Alaska July 10, 2020) (Gleason, J) (granting compassionate release to defendant incarcerated at NSDC in Pahrump due to ongoing COVID-19 pandemic, without specific reference to conditions there, and fact that defendant could not be considered for early release to halfway house or home confinement); *See also United States v. Garcia-Zuniga*, 2020 WL 3403070 (S.D. Cal. June 19, 2020) (granting compassionate release to drug defendant because she could not be considered for early relese to halfway house or home confinement or other BOP programming that the sentencing court recommended).

[18] *Redd*, —— F.Supp.3d ——, ——, 2020 WL 1248493, at *6 (finding extraordinary and compelling reasons based on gross disparity between sentence defendant received and what sentence he would have received after the First Step Act eliminated stacking 924(c) charges in the same indictment and reducing 45-year sentence to 15 years); *United States v Haynes*, —— F.Supp.3d ——, ——, 2020 WL 1941478 (E.D.N.Y. Apr. 22, 2020) (granting compassionate release based on 924(c) stacking, which the First Step Act eliminated).

C. **Miller has exhausted his administrative remedies.**

As explained above, revised § 3582 permits an inmate to move for compassionate release without approval of the BOP.[19]  However, he must have "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on [her] behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."[20]  Both the Supreme Court and Ninth Circuit have instructed against requiring exhaustion of administrative remedies where it would be futile.[21]

More than two months have passed since Miller requested compassionate release from the warden at Lompoc USP file, and the warden has refused to act.[22] Because more than 30 days have passed since Miller made his request and requiring further exhaustion would be futile, he has satisfied the exhaustion requirement.

D. **The COVID-19 pandemic is an extraordinary and compelling reason to grant a sentence reduction.**

Because jails and prisons create a particularly hospitable environment for the spread of disease, Covid-19 spreads rapidly within them, and the Federal Bureau of Prisons is no exception.[23]  By mid-June, the five largest clusters of

---

[19] 18 USC 3582(c)(1)(A).

[20] *Id.*

[21] *See e.g., Ross v. Blake*, 136 S.Ct. 1850, 1855 (2016); *Singh v. Ashcroft*, 362 F.3d 1164, 1169 (9th Cir. 2004) ("it is axiomatic that one need not exhaust administrative remedies that would be futile or impossible to exhaust").

[22] ECF No. 54.

[23] Centers for Disease Control and Prevention, *Guidance for Correctional Detention*,https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (Correctional and detention

8

COVID-19 in this country had grown inside correctional institutions.[24]  In the previous month, the number of known infected incarcerated people doubled and prison deaths increased by 73%.[25]

As of this filing, COVID-19 has expanded its foothold to 105 BOP facilities and 47 RRCs.[26]  These numbers have increased from 93 and 41, respectively, within the last week alone.  There are currently 4,167 federal inmates and 325 BOP staff who have confirmed positive results for the virus.  The inmate count has increased by 684—18.4%—within the last four days.  As of this filing, 98 federal prisoners have died from the disease.  According to the BOP website, there are currently 10 positive inmates at Lompoc UPS and two inmates have died from COVID-19 in this facility. There are 96 additional tests that are pending results.

---

facilities "present unique challenges for control of COVID-19 transmission among incarcerated/detained persons [and] staff[.]");
"Achieving A Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), at https://bit.ly/2W9V6oS (incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings").

[24] Timothy Williams, *et al.*, *Coronavirus Cases Rise Sharply in Prisons Even as They Plateau Nationwide*, June 16, 2020, available at https://www.nytimes.com/2020/06/16/us/coronavirus-inmates-prisons-jails.html.

[25] *Id.*

[26] https://www.bop.gov/coronavirus/ (Last accesed July 21, 2020 at 12:08 p.m.).

The below graphic is also from the BOP website and shows how the virus has spread throughout the BOP:



These numbers will continue to grow and likely understate the true prevalence of COVID-19 in federal jails and prisons.[27]  The BOP's handling of the COVID-19 pandemic has drawn harsh criticism[28] and a flurry of lawsuits.[29]

---

[27] Aspinwall  C, Neff  J. These prisons are doing mass testing for COVID-19—and finding mass infections.  (Accessed June 15, 2020) https://www.themarshallproject.org/2020/04/24/these-prisons-are-doing-mass-testing-for-covid-19-and-finding-mass-infections; Schneider  EC.  Failing the test—the tragic data gap undermining the US pandemic response.  *N Engl J Med*. Published online May 15, 2020. doi:10.1056/NEJMp2014836

[28] https://www.usatoday.com/story/opinion/policing/2020/05/21/bureau-prisons-response-covid-dangerous-public-deserves-answers/5220095002/

[29] https://www.sltrib.com/news/2020/07/13/federal-inmates-sue-weber/

A recent study confirmed not only that COVID-19 spreads more rapidly in jails in prisons, but that the virus is also more deadly for prisoners: prisoners are 5.5 times more likely to contract the virus than the general U.S. population and 3 times more likely to die from the disease:[30]



Figure. Trends in Cumulative Coronavirus Disease 2019 (COVID-19) Confirmed Case Rate per 100 000 People for Prison and US Populations

Data are from the UCLA Law COVID-19 Behind Bars Data Project and the US Centers for Disease Control and Prevention.[3,4] The US population is 327 167 439 and the US prison population is 1 295 285.

---

[30] The Journal of the American Medical Association, "*COVID-19 Cases and Deaths in Federal and State Prisons*, https://jamanetwork.com/journals/jama/article-abstract/2768249 (last accessed July 22, 2020, at 3:30 p.m.) (concluding that inmates are 5.5 times more likely to contract the virus than the general U.S. population and 3 times more likely to die from the disease).

11

**Table.** Mortality Attributable to Coronavirus Disease 2019 (COVID-19) Among Prison and US Populations

| Population by age group, y | Prison population in 1000s[a] | US population | | | Age-specific COVID-19 mortality rate/100 000 | Expected prison deaths/100 000[d] |
|---|---|---|---|---|---|---|
| | | In 1000s[b] | COVID-19 deaths[c] | | | |
| **Men** | | | | | | |
| ≤24 | 115 | 52 333 | 87 | | 0.17 | 0.19 |
| 25-34 | 377 | 22 727 | 433 | | 1.91 | 7.19 |
| 35-44 | 331 | 20 257 | 1184 | | 5.84 | 19.32 |
| 45-54 | 222 | 19 923 | 3236 | | 16.24 | 36.12 |
| 55-64 | 117 | 19 865 | 7558 | | 38.05 | 44.36 |
| ≥65 | 37 | 23 923 | 38 899 | | 162.60 | 60.59 |
| **Women** | | | | | | |
| ≤24 | 8 | 50 545 | 50 | | 0.10 | 0.01 |
| 25-34 | 36 | 22 482 | 207 | | 0.92 | 0.33 |
| 35-44 | 28 | 20 770 | 465 | | 2.24 | 0.63 |
| 45-54 | 16 | 20 776 | 1352 | | 6.51 | 1.06 |
| 55-64 | 6 | 21 890 | 3881 | | 17.73 | 1.10 |
| ≥65 | 1 | 28 865 | 38 254 | | 132.53 | 1.90 |
| **Total[e]** | 1295 | 324 356 | 95 608 | | 29.47 | 172.80[f] |

[a] Derived from 2018 published estimates from US Bureau of Justice statistics (https://www.bjs.gov/content/pub/pdf/p18.pdf).

[b] Estimated from 2019 US Census Bureau data (https://www.census.gov/data/tables/2019/demo/age-and-sex/2019-age-sex-composition.html).

[c] Estimated from the US Centers for Disease Control and Prevention as of June 6, 2020 (https://data.cdc.gov/NCHS/Provisional-COVID-19-Death-Counts-by-Sex-Age-and-S/9bhg-hcku).

[d] Calculated as the age-specific mortality rate in the US population × the prison population.

[e] The age- and sex-standardized mortality ratio is 510/172.8 = 2.95 and was calculated as the observed prison deaths as of June 6, 2020/expected US deaths as of June 6, 2020.

[f] Because prison deaths attributable to COVID-19 are not reported by age and sex strata, an indirect standardization method was used.

Black's Law Dictionary defines "extraordinary" as "[b]eyond what is usual, customary, regular, or common."  As Judge Brody of the Eastern District of Pennsylvania observed in the early days of the pandemic, "nothing could be more extraordinary and compelling than this pandemic."[31]  That Miller is, solely by virtue of his incarceration, five times more likely to contract COVID-19 and three times more likely to die from the disease is alone an extraordinary and compelling reason to grant release.  And although anyone can become severely ill from COVID-19, the risk to Miller is compounded by his underlying medical conditions, which have already resulted in him becoming seriously ill from COVID-19.

---

[31] *United States v. Rodriguez*, 2020 WL 1627331, at *2 (E.D. Pa. April 1, 2020).

12

1
2

**E.      Compassionate release is appropriate because Miller is at heightened risk of severe illness from COVID-19.**

3

According to the Centers for Disease Control and Prevention, people with

4

asthma "might be at increased risk for severe illness from COVID-19." Although

5

asthma is in the "might be at increased risk" category, in Mr. Miller case, the

6

Court does not need to speculate. *See* Exhibit A, Mr. Miller's Medical Records

7

filed under seal.

8

Mr. Miller tested positive for COVID-19 on May 4, 2020. Mr. Miller

9

experienced fever, chills, dry cough and a sore throat while COVID-positive. *Id*.

10

Since that time, he has reported frequent episodes of shortness of breath, chest

11

pain, dizziness and syncope (loss of consciousness). Mr. Miller reports that his

12

health has been declining since he contracted COVID-19. Mr. Miller reported to

13

medical that his sister died from COVID-19 and he is suffering anxiety attacks

14

due to the COVID-crisis.

15

July 17, 2020, Mr. Miller complained of shortness of breath and chest

16

tightness, which were classified in his medical records and "residual COVID

17

symptoms." *Id*.

18

On July 20, 2020, medical was called to Mr. Miller's unit. He was found in

19

"moderate distress" sitting on the ground next to the phone. His initial exam

20

revealed bilateral wheezing in his lungs with notable labored breathing. *Id*.  He

21

was then transferred to HSU (counsel believes medical unit within the BOP).

22

Mr. Miller reported to medical that he used his albuterol inhaler without a

23

positive response, and he is experiencing chest pain at a pain level of 7 out of 10,

24

that radiates to his right-side rib area. Mr. Miller reported this chest pain on and

25
26

13

off for the past six weeks.  His examine revealed mild wheezing and abnormally fast breathing.

On July 22, 2020, Mr. Miller was again tested for COVID-19 and the test was negative. Despite that, Mr. Miller continued to experience chest pain, shortness of breath and other residual COVID symptoms. On July 26, Mr. Miller reported that he had to use his inhaler five times that morning. *Id*.  His assessment on that date revealed "Occasional chest pains with breathing localized to left precordial area, some pleuritic component." *Id*. In other words, tissue in his lungs is inflamed and causing the chest pain when he breathes.[32]

Mr. Miller also reported to medical his is suffering from extreme anxiety over COVID and his health. This anxiety is only heightened by the fact that Mr. Miller reported that his sister passed away from COVID-19.

As Mr. Miller's medical records show, Mr. Miller is one of the many individuals who is suffering from severe residual COVID-19 symptoms.  His chest pain and shortness of breath are likely exacerbated by his anxiety over the pandemic and his conditions of confinement. Recent research into the relationship between the brain and the immune system has found mental illness weakens the immune system, making it easier for viruses like Covid-19 to infect the mentally ill.

According to medical and mental health professionals, "[i]ndividuals suffering from serious mental illness can have compromised immunity and are at risk of severe illness and death during the coronavirus pandemic." *See* Ex. B (Inst. Of Law, Psychiatry, and Public Policy, Univ. of Va. Let. (Mar. 24, 2020)).

---

[32]   https://www.mayoclinic.org/diseases-conditions/pleurisy/symptoms-causes/syc-20351863

"Even people with psychiatric disabilities who are relatively clinically stable now," like Mr. Miller, "may show increased psychiatric symptoms and decreased ability to care for themselves in response to stress, or if their access to medication is interrupted." *Id.* "Some of these individuals may become more fearful, agitated, and/or paranoid as a result of being quarantined to their jail cells for prolonged periods," which may substantially diminish their abilities to care for themselves in the prison environment. *Id.* Because "[e]motions and immunity are tied together by physiological mechanisms, for example during depressed mood states and manic states, the body's ability to produce antibodies and respond to infections can be greatly compromised." *Id.*

This Court should find that Miller has demonstrated "extraordinary and compelling reasons" warranting compassionate release based on the unique risks that COVID-19 poses to prisoners in general and to Miller in particular.

## G.   The applicable § 3553 sentencing factors favor release.

Miller committed serious crimes for which he has been severely punished. He has been in custody for approximately 39 months—a significant amount of time. And this request, if granted, would result in him serving an additional 36 months of supervised release and/or months on home confinement, both subject to strict conditions for which he could be re-imprisoned should he violate them—a hardly insignificant sentence. Commuting Miller's sentence to home confinement will still result in significant punishment, reflect the seriousness of the offense, and promote respect for the law. This is particularly true where, as here, this is the first and only time Mr. Miller has spent in custody. As the Court remembers, prior to this offense, Mr. Miller had no criminal convictions. His only negative contacts with law enforcement were in 2017, when he was given traffic citations

1   for driving on suspended license, expired license plates, driving without due care
2   and stopping in a traffic lane. PSR at 44-45.

3       Further, Mr. Miller has supportive family to help him acclimate to life
4   outside of custody. Mr. Miller's father, Eugene is extremely supportive of him.
5   Eugene lives in West Hills, California with his wife and 15-year old son.
6   Mr. Miller can reside with them upon release.  Mr. Miller's father owns a
7   property management company and works as a barber. Mr. Miller would have
8   immediate employment working in either company.

9       Eugene Miller wants the court to know that he resides near an elementary
10  school.  Should the Court or probation find the location of his residence
11  unsuitable, Mr. Miller's father has the financial ability to find Mr. Miller a
12  suitable residence.  Given the uncertainty of Mr. Miller's release and the
13  logistics, counsel proposes that Mr. Miller be released to his father's residence
14  and if probation finds the location of that residence unsuitable, Mr. Miller has 30
15  to 60 days to move to a suitable residence. If the Court were concerned about
16  Mr. Miller's whereabouts during that time, counsel notes that the Court already
17  imposed a condition of GPS monitoring for up to 3 years after his release.[33]

18                          **Conclusion**

19      The COVID-19 pandemic and the increased risk the virus poses to inmates
20  in general and to Miller in particular is an "extraordinary and compelling reason"
21  warranting compassionate release. Because release is also appropriate in light of
22  the applicable § 3553 sentencing factors, this Court should reduce his sentence to
23  time served (about 39 months), leaving the supervised-release portion of his

24

25

26      [33] ECF. No. 52.

                              16

judgment untouched.  Should this Court believe that additional punishment is necessary, it should modify Miller's conditions to include home confinement.

Dated: July 28, 2020

Rene L. Valladares
Federal Public Defender

*/s/ Heidi Ojeda*
By_____

Heidi Ojeda
Assistant Federal Public Defender

17

## CERTIFICATE OF ELECTRONIC SERVICE

The undersigned hereby certifies that he is an employee of the Federal Public Defender for the District of Nevada and is a person of such age and discretion as to be competent to serve papers.

That on July 28, 2020, he served an electronic copy of the above and foregoing **Emergency Motion for Order Reducing Sentence or Modifying Judgment under 18 U.S.C. § 3582(c)(1)(A)(ii) (Expedited Ruling Requested due to COVID-19 pandemic)** by electronic service (ECF) to the person named below:

NICHOLAS A. TRUTANICH
United States Attorney
ELIZABETH WHITE
Assistant United States Attorney
501 Las Vegas Blvd. South
Suite 1100
Las Vegas, NV 89101

*/s/ Rosana Aporta*
Employee of the Federal Public Defender

18